UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                    :

IN RE SONY SXRD REAR PROJECTION TELEVISION :
CLASS ACTION LITIGATION                 :   06 Civ. 5173 (RPP)
                                   :

This Document Relates to:                :   ECF CASE
                                   :

ALL ACTIONS                           :
                                   :
                                   :
------------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF THE PROPOSED CLASS ACTION SETTLEMENT

FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
1633 Broadway
New York, New York  10019
(212) 833-1100

*Attorneys for Defendants Sony*
*Electronics Inc., Sony Corporation,*
*and Sony Corporation of America*

February 15, 2008

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF FACTS .................................................................................................2

    The Televisions ..........................................................................................................2

    The Complaint ...........................................................................................................4

    Sony's Defenses ........................................................................................................5

    Negotiations and the Preliminary Approval of the Settlement ...........................7

    The Terms of the Settlement ....................................................................................8

        1.      The Composition of the Class ..................................................................8

        2.      The Settlement Benefits ...........................................................................8

                a.      Extension of the Optical Block Warranty ....................................9

                b.      Enhanced Warranty Fulfillment ...................................................9

                c.      Reimbursement of Repair and Related Expenses .......................9

                d.      Litigation Costs ...........................................................................10

    Notice to the Class and the Response Thereto ....................................................10

ARGUMENT ...................................................................................................................10

    I.      THE SETTLEMENT SHOULD BE APPROVED AS
            FAIR AND REASONABLE ...............................................................................10

            A.      Courts Should Approve Reasonable Class Action Settlements ...............10

            B.      Continued Litigation Would Be Uncertain and Expensive .....................11

            C.      The Settlement Provides Significant Benefits to the Class .....................15

D.     The Settlement Was Reached Through Intensive Arm's-Length Negotiations ............................................................................................. 17

E.     The Class Has Supported the Proposed Settlement Overwhelmingly ....... 19

II.     THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT .......... 19

A.     The Replacement Optical Blocks Resolve the Green and Yellow Issues ...................................................................................... 20

B.     The Length of the Warranty Extension Is Fair and Reasonable ................ 21

C.     There is No Basis for Refunding The Cost of Third-Party Extended Service Contracts ..................................................................... 22

D.     A Purchase Price Refund Would Not Be a Compromise .......................... 23

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

*Page(s)*

*Ball v. Sony Elecs. Inc.*,
    No. 06-C-307-S, 2005 WL 2406145 (W.D. Wis. Sept. 28, 2005) .................................... 12

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) ............................................................................ 10, 11, 15, 18

*Gross v. Sys. Eng'g Corp.*,
    Nos. 80-0803 & 80-3238, 1983 WL 160568 (E.D. Pa. Mar. 31, 1983) ............................ 12

*Hosfeld v. Weyerhaeuser Mortgage Co.*,
    No. 99C 1966, 2003 WL 22229255 (N.D. Ill. Sept. 26, 2003) .......................................... 13

*In re Am. Bank Note Holographics*, Inc.,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................................................................ 19

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ........................................................................................... 13

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992) ............................................................................................... 10

*In re Ford Motor Co. Ignition Switch Prods. Liability Litig.*,
    194 F.R.D. 484 (D.N.J. 2000) ............................................................................................ 13

*In re Frost Bros., Inc.*,
    992 WL 373488 (S.D.N.Y. Dec. 2,1992) .......................................................................... 10

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................... 18

*In re Holocaust Victim Assets Litig.*,
    424 F.3d 132 (2d Cir. 2005) ............................................................................................... 11

*In re Jackson National Life Ins. Co. Premium Litig.*,
    183 F.R.D. 217 (W.D. Mich. 1998) ................................................................................... 13

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ......................... 17, 18

*In re Rezulin Prods. Liab. Litig.*,
    392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................................................................... 11

Page(s)

*In re Safety Components, Inc. Sec. Litig.*,
   166 F. Supp. 2d 72 (D.N.J. 2001) ................................................................15

*In re Veeco Instruments, Inc. Sec. Litig.*,
   No. 05 MDL 0165 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ...........14

*In re Warner Communications Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ................................................................19

*Jones v. Amalgamated Warbasse Houses, Inc.*,
   97 F.R.D. 355 (S.D.N.Y. 1982) ......................................................................18

*Karnuth v. Rodale, Inc.*,
   No. Civ. A. 03-742, 2005 WL 1683605 (W.D. Va. July 18, 2005)...................13

*Leider v. Ralfe*,
   No. 1:01-CV-3137, 2003 WL 24571746 (S.D.N.Y. Mar. 4, 2003) ..................11

*Lyon v. Caterpillar, Inc.*,
   194 F.R.D. 206 (E.D. Pa. 2000)......................................................................13

*Oberlander v. Monarch Life Ins. Co.*,
   274 A.D.2d 563, 712 N.Y.S.2d 557 (2d Dep't 2000) ......................................11

*Plymack v. Copley Pharmaceutical, Inc.*,
   No. 93 Civ. 2655 (KMW), 1995 WL 606272 (S.D.N.Y. Oct. 12, 1995) ...........12

*Stewart v. Avon Prods., Inc.*,
   No. Civ. A. 98-4135, 1999 WL 1038338 (E.D. Pa. Nov. 15, 1999)..................13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)...............................................................11, 17, 19

Defendants Sony Electronics Inc., Sony Corporation, and Sony Corporation of America (collectively, "Sony"), respectfully submit this memorandum of law in support of the final approval of the proposed class action settlement.

## PRELIMINARY STATEMENT

By Order dated October 23, 2007, the Court granted preliminary approval to the parties' proposed settlement. In accordance with that Order, notice of the settlement has been distributed to class members by mail or e-mail, publication, and posting on the Internet. The time for opt-outs and objections has expired, and the parties now ask the Court to grant final approval, resolving this action.

The proposed settlement which, *inter alia*, reimburses the expenses incurred by class members for the repair or replacement of the television optical block at issue, and also extends the warranty on the optical block so that future repairs, if necessary, will be conducted in-home and provided without cost, is fair and reasonable, especially in light of the risks plaintiffs and the class would confront if the litigation were to continue. Sony has substantial defenses on the merits, and both the individualized inquiry that would be necessary to determine which class members were actually injured, as well as the need to apply the materially different laws of virtually every state, would create insuperable manageability difficulties that would prevent the certification of a class for litigation purposes.

Response to the settlement – which was achieved only after informal and formal discovery, and months of intense, arm's-length negotiations (including mediation before retired California Court of Appeal Justice Richard C. Neal) – has been overwhelmingly positive. Only 22 class members (about 0.0128% percent of the class) opted out, and only 45 wrote letters that can be characterized as objections, all of which, as explained below, are insubstantial.

**STATEMENT OF FACTS**

**The Televisions**

In September 2005, Sony began manufacturing a new rear projection, high-definition television branded as "SXRD." (Declaration of Jean-Pierre Guillou ("Guillou Decl.") ¶ 2.) Sony produced both a 50-inch diagonal version (model number KDS-R50XBR1) and 60-inch diagonal version (model number KDS-R60XBR1) of the SXRD (together, the "Televisions"). (*Id.*) The Televisions were successful in the market, receiving enthusiastic reviews and awards praising their rich and highly detailed picture, their exceptional contrast ratio, their extensive feature set, etc. (*Id.*)

It is typical that after any high-technology product, no matter how well received, reaches the market, the manufacturer continues to refine the design and the manufacturing process. Innovation at Sony is continuous, and design and process improvements are incorporated into new units as they are manufactured. (*Id.* ¶ 3.) That is how Sony regularly does business and that was the case with the Televisions; Sony made various improvements on a continuing basis between October 2005 and September 2006, when the Televisions were superseded by newer products. (*Id.*)

Although the great majority of the Televisions performed well and without incident, two issues that are the subject of this lawsuit did appear unexpectedly in some Televisions after sales began. (*Id.* ¶ 4.) Some of the improvements Sony made between October 2005 and September 2006 addressed those two issues, and resolved them. (*Id.*)

It is normal to see a faint green hue in the center of an SXRD television for the first few minutes after it is turned on. (*Id.* ¶ 5.) In some Televisions, however, the green hue persisted longer (the "green issue"). (*Id.*) In most instances, this was caused by variations in the

temperature at which the sets were "calibrated" – at which various settings were fixed – on the assembly line.  (*Id.*)  The issue was largely resolved in October 2005 when Sony made a minor adjustment to its manufacturing process to ensure temperature uniformity on the assembly line.  (*Id.*)  Only about 7000 (out of 172,000) Televisions had been manufactured at that point, so the great majority of sets that manifested the green issue were among the first 7000 produced.  (*Id.*)[1]

A very small number of Televisions manifested the green issue for different reasons, and other improvements eliminated those possible causes.  The optical block of the SXRD (the equivalent of the picture tube in a conventional set) contains three LCD panels – red, blue and green.  A few sets contained green and blue panels from different production runs, which could cause the green issue.  (*Id.* ¶ 6.)  In January 2006, Sony stopped using mixed panels in the optical block.  (*Id.*)  In January 2006, Sony tightened the specification for the space between the glass and silicon layers in the blue panel.  A handful of sets manufactured before January 2006 may have had a green issue because of a larger space.  (*Id.*)

In some Televisions, a yellow discoloration appeared, usually in a corner or along the periphery of the screen, after the set had been used for some period of time (the "yellow issue").  This was caused by microscopic material introduced into some blue LCD panels during the sealing process.  Over time, as this material was exposed to ultraviolet light from the Television's lamp, the yellow problem could occur.  (*Id.* ¶ 8.)  The likelihood of a yellow problem depends on the amount of this material present, which varies from set to set, and on the

---

[1] Even among the first 7000, most sets were properly calibrated and did not have a green issue.  (Guillou Decl. ¶ 5.)

extent of ultraviolet exposure, which depends, in turn, on how long and in what manner the consumer uses his or her Television.  (*Id.* n.2.)

Collectively, several of the improvements Sony introduced in 2006 resolved the yellow issue.  (*Id.* ¶ 9.)   In March, Sony added a second UV filter to the optical block, reducing the amount of UV light to which the LCD panel is exposed.  (*Id.*)  In July, the filters were improved to capture more UV energy.  (*Id.*)  Between May and September, the blue panel manufacturing process was changed several times, lowering the sealing temperature and thus significantly reducing the presence of the microscopic material.  (*Id.*)

The improvements discussed above were phased in over time, so the precise combination of improvements reflected in the Television purchased by any class member depends on precisely when the set was manufactured.  Similarly, if any class member had an optical block replaced before late October 2006, the time by which optical blocks with *all* of the improvements reached Sony's distribution facility in the United States (*Id.* ¶ 10), the improvements contained in the replacement unit depended on its date of manufacture.  Going forward, if any class member's Television manifests a problem requiring replacement of the optical block, the replacement block will incorporate all of the improvements that have eliminated the green and yellow issues.  (*Id.*)

**The Complaint**

Michael Cook filed the original complaint in this action on July 7, 2006.  An identical complaint was filed by Paul Krasnoff on September 29, 2006.  The Court consolidated the two actions on December 22, 2006, and plaintiffs thereafter filed a consolidated complaint. After Sony moved to dismiss the consolidated complaint, plaintiffs filed a First Amended Consolidated Class Action Complaint, dated February 19, 2007 (the "Complaint"), which, *inter*

4

*alia*, added sixteen new plaintiffs. (A copy of the Complaint is attached as Exhibit 1 to the Declaration of Mary E. Mulligan ("Mulligan Decl.").) In essence, the Complaint alleges that the green and yellow issues reflect an inherent defect in all of the Televisions. Accordingly, the Complaint posits a class consisting of every person in the United States who bought a Television. It asserts nine causes of action: statutory consumer protection claims under the law of California (Counts 1-3); statutory consumer protection claims under the laws of 44 other states and the District of Columbia (Count 4); statutory breach of warranty claims under California and federal law (Counts 5-6); common law breach of express and implied warranty claims (Counts 7-8); and unjust enrichment (Count 9).[2]

## Sony's Defenses

To begin with, Sony believes the Complaint fails on its face. All of the California claims fail because, under settled New York choice of law rules, each purchaser's consumer protection or warranty claim will be governed by the law of the state of his or her residence. None of the plaintiffs resides in California. All of the warranty claims fail because plaintiffs do not allege a breach. Sony did not promise that no Television would ever have a problem. It promised that if a product *was* defective, it would be repaired or replaced. Not one of the plaintiffs alleges that he or she sought a warranty repair but was denied one. The unjust enrichment claim fails because plaintiffs assert a claim under a written contract, and the claims under the consumer statutes of some 45 jurisdictions fail for a variety of reasons: some state statutes prohibit class actions, some require notice plaintiffs did not provide; plaintiffs do not

_____

[2] A few days before the Complaint was filed, a virtually identical case was filed in California state court, on behalf of a class of California purchasers. The proposed settlement will resolve the California case as well.

adequately allege injury, or do not allege reliance or causation. For these reasons and others, the Complaint would not survive a motion to dismiss.[3]

Even more fundamentally, plaintiffs' principal allegation – that every Television, no matter when manufactured, contains an inherent defect – is wrong on the facts. As explained above, from the outset, Sony began making improvements that reduced and then eliminated the possibility of a green or yellow issue. Indeed, not one of the eighteen named plaintiffs alleges that his or her Television actually manifested either a green or a yellow issue. Moreover, not a single plaintiff alleges that Sony breached its promise to repair any Television that did manifest a problem.

Finally, this case could not be litigated as a class action. The central question – whether a class member was injured – cannot be determined from class-wide proof because the presence of a green or yellow issue is contingent on the specific characteristics of each optical block, the conditions under which the Television was manufactured, and on the customer's pattern of use. (Guillou Decl. ¶ 8 & n. 2.) Thus, each plaintiff would have to prove individually that his or her set did, in fact, have a problem. Similarly, each would have to prove individually that he or she sought a warranty repair and was either refused a remedy or that the remedy was ineffective. And where, as here, a court is asked to apply the consumer laws of some 45 different jurisdictions, the case becomes unmanageable and class certification is almost never proper.

---

[3] Sony made a motion to dismiss on March 21, 2007. Plaintiffs never filed a response. A copy of Sony's brief in support of the motion is attached as Exhibit 2 to the Mulligan Decl.

## Negotiations and the Preliminary Approval of the Proposed Settlement

Despite the strength of its defenses, Sony agreed to negotiate a possible resolution of this case to avoid the risks and burdens inherent in complex, class action litigation, and to direct funds that would otherwise be consumed by litigation expenses to the benefit of its customers. Beginning in November 2006 and continuing through May 2007, the parties conducted intensive arm's-length negotiations. (Mulligan Decl. ¶ 5.) After a face-to-face mediation and several telephone sessions before Richard C. Neal, a retired justice of the California Court of Appeal, the parties reached agreement on all aspects of class compensation. Thereafter, they began negotiations over plaintiffs' counsel fees, reaching agreement only after another mediation session (and further telephone follow-up) with Justice Neal. (*Id.*)

During the course of negotiations and continuing after a settlement in principle was reached, plaintiffs conducted formal and informal discovery (including discovery from third parties) designed to establish the relevant facts: the nature and cause of the green and yellow issues; the improvements Sony made that resolve those issues; the timing and efficacy of the improvements; and Sony's ability to replace any optical block manifesting a green or yellow issue with an optical block containing all of the improvements. Plaintiffs' counsel reviewed the underlying engineering documents and interviewed senior Sony personnel with knowledge of all relevant matters. (*Id.* ¶ 6.)

In an October 23, 2007 order (the "Order"), the Court granted preliminary approval to the proposed settlement. (A copy of the Order is attached as Exhibit 5 to the Mulligan Decl.) The Order preliminarily certified a Settlement Class, appointed Class Counsel, and preliminarily concluded that the settlement was "fair, reasonable, adequate, and in the interest of the Settlement Class as a whole . . . ."

The Order scheduled the final settlement approval hearing for February 27, 2008, and required that, by December 27, 2007, Sony notify class members of the proposed settlement, of the hearing, and of their rights with respect thereto, by direct mail or e-mail (for those class members for whom Sony has contact information), publication in *USA Today*, and by the establishment of an Internet website.

**The Terms of the Settlement**[4]

### 1. The Composition of the Class

The parties defined the Settlement Class to include all persons who purchased a Television, or received one as a gift, for non-commercial purposes. Sony employees and their families were excluded from the class, as were claim aggregators and persons claiming to be assignees of rights associated with the Televisions. The Televisions were sold by Sony from approximately September 2005 to July 2006 and, as defined, the Settlement Class has approximately 172,000 members.

### 2. The Settlement Benefits

The settlement is designed to ensure that any class member whose Television manifests a yellow or green issue (or any other problem with the optical block) can have the optical block replaced in-home without cost and with maximum convenience. The settlement is also designed to reimburse class members for any expense they might incur, prior to the effective date of the settlement, in connection with the repair of a Television optical block. To those ends, the settlement provides:

---

[4] A copy of the settlement agreement is attached as Exhibit 4 to the Mulligan Decl.

a.     **Extension of the Optical Block Warranty.**  The Televisions came with a one-year limited warranty pursuant to which Sony promised to repair or replace a defective Television.  (A copy of the original limited warranty is attached as Exhibit 3 to the Mulligan Decl.)  The Televisions were sold by Sony between September 2005 and July 2006, so class members' warranties were scheduled to expire between September 2006 and July 2007.[5]  Under the terms of the settlement, the warranty with respect to the optical block (which includes, but is not limited to, the green and yellow issues) will be extended through June 30, 2009.

b.     **Enhanced Warranty Fulfillment.**  During the warranty extension period, Sony will maintain a dedicated toll-free telephone number for class members to obtain a diagnosis of any problem from a dedicated technical representative who will also arrange for in-home service and for any necessary parts shipments.  If Sony is unable to ship a replacement optical block, if necessary, within 14 days following the initial telephone diagnosis, the class member will have the option of exchanging his Television for a remanufactured SXRD television.

c.     **Reimbursement of Repair and Related Expenses.**  Upon submission of a valid proof of claim, any class member who incurred out-of-pocket expenses prior to the effective date of the settlement for the replacement of an optical block (including shipping costs) will be reimbursed for all such expenses (that have not already been reimbursed).  Upon submission of appropriate documentation, class members who purchased an extended service contract from Sony after July 15, 2006 and before the effective date of the settlement will be

---

[5] Most consumers buy from retailers rather than directly from Sony.  Some sets may have been bought from retailers in the months after July 2006.

reimbursed for the cost of the service contract if they wish to cancel it. Any class member who required more than one optical block repair before the effective date of the settlement and who elected to upgrade to an XBR2, A2000 or A2020 SXRD television will be reimbursed for the cost of the upgrade.

        d.      **Litigation Costs.** Sony will pay all costs of settlement administration, including notice, and will pay plaintiffs' reasonable counsel fees and expenses as awarded by the Court, up to $1,600,000, in addition to, rather than as a deduction from, the benefits provided to the class.

## Notice to the Class and the Response Thereto

        Notice of the proposed settlement was distributed to class members in the form and in the manner directed by the Court. (Declaration of Alexis Cohen ¶¶ 2-5.) The response of the class has been overwhelmingly positive. Only 22 potential class members asked to be excluded. (Mulligan Decl. ¶ 10.) That is approximately 0.0128% percent of the class. The parties received only 45 objections, discussed below, none of which was substantial. (*Id.*)

**ARGUMENT**

**I.**

**THE SETTLEMENT SHOULD BE APPROVED AS FAIR AND REASONABLE**

    A.      **Courts Should Approve Reasonable Class Action Settlements**

        Fair and reasonable class action settlements should be approved. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). In evaluating a proposed settlement, the Court should consider the balance between the concrete, immediate benefits provided to the class and the risks, complexity, and delay that would follow from continued litigation. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Ciir. 1992); *In re Frost Bros., Inc.*, 1992

WL 373488, at *5 (S.D.N.Y. Dec. 2, 1992).  The Court should also consider the competence and experience of class counsel supporting the settlement, *see In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 138 (2d Cir. 2005), the extent to which the settlement was the product of adequate investigation and arm's-length negotiations, *see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir. 2005), and the proportion of class members opting out or objecting to the settlement, *D'Amato*, 236 F.3d at 78.

## B.     Continued Litigation Would Be Uncertain and Expensive

If this case is not settled, it may well be dismissed.  On March 21, 2007, Sony filed a motion to dismiss the Complaint in its entirety; plaintiffs have never responded.  Sony's brief, which is attached as Exhibit 2 to the Mulligan Decl., sets forth the grounds for the motion in detail, but for present purposes it suffices to highlight two fundamental weaknesses in plaintiffs' case.

In various permutations, plaintiffs assert two principal causes of action – a statutory consumer protection claim under California law and a breach of warranty claim under both state and federal law.  The former fails because California law has no application to this case.  The latter must be dismissed because plaintiffs do not allege facts constituting a breach of warranty.

The state in which a plaintiff purchased an allegedly defective product has the greatest interest in the application of its consumer protection laws to the transaction.  Accordingly, in class actions, the courts have consistently held that each class member's consumer protection claim is governed by the law of his or her home state.  *See In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 612 (S.D.N.Y. 2005); *Leider v. Ralfe*, No. 1:01-CV-3137, 2003 WL 24571746, at *11 (S.D.N.Y. Mar. 4, 2003); *Oberlander v. Monarch Life Ins.*

*Co.*, 274 A.D.2d 563, 564, 712 N.Y.S.2d 557, 557-58 (2d Dep't 2000); *Plymack v. Copley Pharmaceutical, Inc.*, No. 93 Civ. 2655 (KMW), 1995 WL 606272, at *4 (S.D.N.Y. Oct. 12, 1995) (all applying the consumer laws of the state in which the plaintiff made his purchase). Here, not one named plaintiff resides in California, and the case has no other connection to that state (SXRD televisions were designed in Japan and assembled in Pennsylvania) that might disturb this analysis and point away from the various laws of plaintiffs' home states. Thus, the California consumer protection claim is not viable. As discussed below, in the context of a class action, this is not merely a choice of law problem but a fatal defect in the case. The need to apply the laws of dozens of different jurisdictions makes a class action unworkable.[6]

Plaintiffs' warranty claim proceeds from the false premise that, if a Television has a defect, the warranty has been breached. But Sony did *not* promise that none of the Televisions would be defective. On the contrary, the company promised that, for one year, it would repair any defective Television without charging for either parts or labor. *See, e.g., Ball v. Sony Elecs. Inc.*, No. 05-C-307-S, 2005 WL 2406145, at *3 (W.D. Wis. Sept. 28, 2005) ("Defendant's express promise to remedy defects in a product is not a representation that there are none, but an acknowledgment that there might be"). Not one of the named plaintiffs alleges that he or she demanded a warranty repair from Sony that Sony failed or refused to make. On these facts, the Complaint simply does not make out a claim for breach of warranty. *See Gross v. Sys. Eng'g Corp.*, Nos. 80-0803 & 80-3238, 1983 WL 160568 (E.D. Pa. Mar. 31, 1983) (dismissing

---

[6] It is precisely because the case will fail as a class action if the laws of multiple jurisdictions apply that plaintiffs pleaded the case as if California law governed the claims of all class members.

warranty claim where plaintiff failed "to present the computer equipment to [defendant] for repair or replacement").

Even if some portion of the Complaint survived, this case could not proceed as a class action. A class action must be manageable, and the courts have consistently held that a case requiring the application of the law of many different jurisdictions is *not* manageable, and that, in such a case, a class should not be certified. *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (holding that the application of consumer fraud acts of all U.S. states and territories was necessary and denying nationwide and statewide class certification on grounds of unmanageability); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 218-21, 223 (E.D. Pa. 2000) (denying nationwide class certification because application of the laws of 50 states would, *inter alia*, render class action unmanageable); *Karnuth v. Rodale, Inc.*, No. Civ. A. 03-742, 2005 WL 1683605, at *3-*5 (W.D. Va. July 18, 2005) (denying certification because consumer fraud laws of each class member's state of residence applied); *In re Ford Motor Co. Ignition Switch Prods. Liability Litig.*, 194 F.R.D. 484, 489-90 (D.N.J. 2000) (holding that the "significant differences between states' causes of action for . . . deceptive trade practices" require denial of nationwide class certification).[7]

Class certification would also likely be denied because the facts each class member would have to prove to establish injury – a green or yellow issue with the class member's Television and Sony's failure to repair the problem under the warranty – cannot be

---

[7] Courts have likewise held that the application of the law of all 50 states to breach of contract claims precludes class certification. *See, e.g.*, *Stewart v. Avon Prods., Inc.*, No. Civ. A. 98- 4135, 1999 WL 1038338, at *5 (E.D. Pa. Nov. 15, 1999); *Hosfeld v. Weyerhaeuser Mortgage Co.*, No. 99C 1966, 2003 WL 22229255, at *1 (N.D. Ill. Sept. 26, 2003); *In re Jackson National Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 223 (W.D. Mich. 1998).

proved on a class-wide basis.  Only a minority of Televisions have ever manifested a green or

yellow problem.  Whether a given Television will have a problem depends on the precise

conditions under which it was manufactured and the manner in which it has been used, facts that

vary from set to set and class member to class member.  (Guillou Decl. ¶ 8 & n. 2.)  Likewise,

whether a class member sought a warranty repair, whether the repair was made if requested, and

whether the repair solved the problem, are all essential facts with respect to a breach of warranty

claim that can only be proved individually.  In short, there is no way to determine an entitlement

to relief in this case based on facts common to all class members; each class member would have

to prove his or her individual entitlement based on facts particular to him or her.[8]

Sony is prepared to defend this case vigorously. Were this litigation to continue,

plaintiffs would face extensive, expensive, and risky motion practice before the case proceeded

past the pleadings and before a class could be certified.  Thereafter, if the case survived,

plaintiffs would face a highly technical litigation requiring them to review and understand

complex engineering documents, the vast majority in Japanese.  Undoubtedly, plaintiffs would

have to spend millions of dollars, and it would be years before members of the class would see a

recovery, if they ever saw any recovery at all.  Under such circumstances, final approval of the

proposed settlement is entirely justified.  *See, e.g.*, *In re Veeco Instruments, Inc. Sec. Litig.*, No.

05 MDL 0165 (CM), 2007 WL 4115809, at *7 (S.D.N.Y. Nov. 7, 2007) (approving settlement

and holding that "[d]elay, not just at the trial stage but through post-trial motions and the

---

[8] In this regard, it is striking that not one of the named plaintiffs even alleges that his or her
set actually manifested any discoloration.  Likewise, not one alleges that he or she sought, but
was unable to get, a successful warranty repair.

appellate process, would cause Class Members to wait years for any recovery, further reducing its value").

C.    **The Settlement Provides Significant Benefits to the Class**

The Court must consider whether the benefit provided to class members is reasonable in light of the best possible recovery and the risks plaintiffs would face if the case went to trial. *See D'Amato*, 236 F.3d 78 at 86 (2d Cir. 2001). In evaluating this factor, it must be remembered that "settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution . . . ." *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 92 (D.N.J. 2001). Here, the settlement provides a comprehensive remedy to class members, ensuring that they will receive a cost-free and efficacious in-home repair should they experience a green or yellow issue (or any other problem with the optical block), and reimbursing them for out-of-pocket expenses if they have an optical block repair. Given the substantial risk that plaintiffs would be unable to prove liability and the substantial risk that they would be unable to maintain this case as a class action, the settlement is more than fair.

Most class members who have had their Televisions repaired to correct a green or yellow issue received the repair pursuant to the Sony limited warranty and they did not have to pay for parts or labor. Anyone whose Television was out of warranty when the issue was fixed will be reimbursed under the settlement (if they have not already been reimbursed) for the out-of-pocket cost. Most class members who purchased extended service contracts did so at the time of purchase, and they did so to protect against the full range of possible repairs. Those consumers got what they paid for and they are protected, in accordance with the terms of their plans, against the cost of any repair that may be necessary, whether or not related to the green or

15

yellow issue or to the optical block. A small number of customers, however, bought extended service plans from Sony at a later date, either because they had needed a repair to fix a green or yellow issue and were concerned that the problem might recur, or because they learned that other consumers had had a green or yellow issue and wanted to be sure that any repair would be free should they see a similar problem. For those consumers, the warranty extension provided through the settlement duplicates the protection they bought, and Sony will reimburse the cost of the extended service plan for those customers if they notify Sony that they want to cancel their plans. Thus, the settlement reimburses class members for all reasonable and predictable out-of-pocket costs related to the green and yellow issues.

For the majority of class members, who have not had a green or yellow issue, the settlement creates a three to almost four-year warranty period (depending on date of purchase) within which they can receive a replacement optical block for free, should it become necessary.[9] Should these class members experience a green or yellow issue, a dedicated team of technicians will ensure that the problem is diagnosed and remedied, in-home, as quickly as possible. Should Sony be unable to ship a new optical block within 14 days, the class member will have the option to trade his or her Television for a replacement.

In short, the settlement reimburses class members for any expense they have already incurred in connection with the green or yellow issue, and it insulates them from any

---

[9] Extending the warranty to a date certain, rather than for some period of time after purchase, will simplify warranty claims. Class members will not have to prove when they bought their Televisions and demonstrate that their particular set is still under warranty. Any optical block repair before June 30, 2009 will be covered, regardless of when the customer bought his Television. Moreover, this approach creates the longest warranty for those who bought the earliest Televisions, i.e., those sets which contain the fewest improvements.

future expense for a period three to four times longer than a standard warranty.  In other words,

class members have been fairly compensated for any injury they have suffered, and they are

protected against any future injury for years longer than is typical for consumer electronics.

Were the litigation to continue, on the other hand, class members might not get anything and, at

best, they would wait years for relief while potentially facing more than $1000 in repairs while

they waited.  Measured against the risks and delays that would follow from continued litigation,

and the relief that might be expected even if plaintiffs ultimately achieved some recovery, the

settlement is very much in the best interest of the class.

      **D.**       **The Settlement Was Reached Through Intensive Arm's-Length Negotiations**

Negotiations began in November 2006 and continued through June 2007.

Counsel met and spoke on many occasions and conducted a full-day mediation before a retired

California appellate judge, Richard C. Neal, in April 2007.  Thereafter, the parties spoke several

times with the mediator by telephone.  Agreement on class compensation issues was reached in

May 2007 and the parties then negotiated over counsel fees, returning to California for another

session with Justice Neal in mid-June.  A follow-up telephone mediation session in late June

produced a final agreement.  (Mulligan Decl. ¶ 5.)

Settlements, like this one, that result from extensive, lengthy negotiations,

conducted by experienced counsel acting at arm's-length, are entitled to a fair amount of

deference.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)

(where settlement resulted from arm's length negotiations between capable counsel, a

"presumption of fairness, adequacy, and reasonableness may attach"); *In re PaineWebber Ltd.*

*P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("[s]o long as the integrity of the arm's

length negotiation is preserved … a strong initial presumption of fairness attaches to the

proposed settlement"), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Likewise, the judgment of class counsel, who have led the negotiations and concluded that the proposed settlement is the best that can be achieved, is another factor that weighs heavily in favor of approval of the settlement. *See In re PaineWebber*, 171 F.R.D. at 125 ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

The parties' negotiations were informed by discovery, some of it informal, of the essential facts concerning the cause of the green and yellow issues and the manufacturing and design improvements Sony made between October 2005 and September 2006 that addressed those issues. (Mulligan Decl. ¶ 6.) Sony provided thousands of pages of internal documents to plaintiffs, as well as access to appropriate Sony engineering personnel. (*Id.*) Although the parties did not undertake years of formal, adversarial discovery here, that is not required. To the contrary, the class benefits from all of the expense avoided, and the speed with which benefits can be distributed. Informal discovery is a valid means of developing the facts, and early settlements are to be actively encouraged. *See, e.g.*, *D'Amato*, 236 F.3d at 87 ("although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information. [This] factor also weighed in favor of settlement approval"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims."); *Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 360 (S.D.N.Y. 1982) ("Although little formal discovery has occurred, the parties freely exchanged data during settlement talks. In view of the way this speeds the negotiation process, informal 'discovery' is to be encouraged."). The parties conducted informal pre-settlement and confirmatory discovery designed to elicit the facts necessary to evaluate the claims and the

adequacy of the settlement; the absence of more extensive formal discovery raises no problem for the settlement.

**E.    The Class Has Supported the Proposed Settlement Overwhelmingly**

The positive reaction from the class provides further evidence that the proposed settlement is fair and adequate.  Of the approximately 172,000 class members, only 22 (0.0128%) have chosen to opt out.  (Mulligan Decl. ¶ 10.)  Only 45 have voiced objections.  (*Id.*) The small number of opt outs and objectors relative to the size of the class supports approval of the proposed settlement.  *See Wal-Mart*, 396 F.3d at 118-19 ("the class appears to be overwhelmingly in favor of the Settlement ….  Indeed, the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our … inquiry"); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) ("the lack of objections may well evidence the fairness of the Settlement"); *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985) (approving settlement where few objections were filed, and only "a fraction of one percent of the class" opted out of the settlement).

## II.

## THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT

Of the 45 class members who wrote to criticize the settlement, several raised issues that were particular to them or that no other class member echoed.  One, for example, wanted compensation for other problems (unrelated to the optical block) he claims to have had with his Television, and another wanted compensation for a circuit board allegedly broken by a

Sony-authorized repairman. Those issues are not addressed by this settlement and any claim the class member might have will not be released.[10] Another class member upgraded to an XBR3 flat panel television after two repairs to his set and he wants to be compensated for the upgrade cost. He notes that the settlement does reimburse the cost of an upgrade for those who switched to an XBR2, A2000 or A2020 SXRD television after two optical block repairs. But those televisions are all rear projection models similar to the Televisions the customers had originally bought. Sony permitted the upgrade to ensure that the customers would be satisfied that they would own the trouble-free rear projection television they had paid for. The objecting class member chose to buy an entirely different television – a flat panel LCD (which included a premium price for its thin form) instead of a rear projection television. There is no reason to reimburse the cost of a switch to a fundamentally different product. In any event, if any class member felt that, because of some circumstance unique to him, he suffered some injury different from or greater than the rest of the class, he had the right to opt out.

Most of the objections raised the same few issues, each of which is addressed below.

A.      **The Replacement Optical Blocks Resolve the Green and Yellow Issues**

Several objectors expressed a fear that even after their optical blocks were replaced, the green and yellow problems would be likely to recur. This concern is apparently

---

[10] One objector thinks the settlement should cover Televisions purchased for commercial purposes. Such sets were excluded because commercial sets are used far differently than sets purchased for home use and because many consumer protection statutes do not apply to commercial purchasers. In any event, as a commercial purchaser, the objector is not a class member (and he thus lacks standing to object) and he is not releasing any claims. The settlement simply does not affect him.

based on repairs that were made before Sony had implemented all the improvements that addressed the green and yellow issues. As discussed above, Sony made many improvements, on a rolling basis, between October 2005 and September 2006. Some Televisions repaired before all the improvements had been made did require a second repair. However, under the settlement, all repairs performed during the warranty extension period will be made with post-September 2006 optical blocks. (Guillou Decl. ¶ 10)

### B.  The Length of the Warranty Extension Is Fair and Reasonable

Although a number of objectors would like the warranty to be extended indefinitely, or for several additional years, an extension through June 2009 is fair to the class. Neither Sony nor other consumer electronics retailers warrant that their products will be free from failure indefinitely, nor does the law require such a promise. The original limited warranty here was for one year. Under the settlement, the warranty will last for three years or more, not only with respect to the green and yellow issues but with respect to any problem with the optical block. While plaintiffs and class members would doubtless like more, the question before the court is not whether the class got everything it might want, but whether the settlement is fair as a compromise of contested litigation. A warranty extension of several years – which would cost hundreds of dollars if purchased commercially (as several objectors have themselves noted) – is more than fair.

The reasonableness of the warranty extension is particularly clear in light of the nature of the green and yellow issues. The green issue, if it arises at all, arises at the outset, as soon as the Television is used. (Guillou Decl ¶ 7.) A three to four year warranty will thus allow class members far *more* time than they need to observe and address any green issue. The yellow issue may not arise until after the set has been used for an extended period, but the problem is

highly likely to appear, if at all, in far less than three years. When the yellow issue appears, it typically does so after the set has been used for no more than 3000 hours. (*Id.* ¶ 11.) Based on industry statistics, the average television in the United States is on for 6.7 hours a day, so 3000 hours is reached in less than 15 months. (*Id.*) Accordingly, for the minority of sets likely ever to see a yellow issue, the vast majority will do so in far less than three years.

While it is impossible to say that no consumer will first see a yellow problem more than three to four years after the set is purchased, the fact that some *de minimis* number of class members may ultimately have a problem that is not covered by the warranty does not alter the fact that the settlement provides comprehensive relief to the overwhelming majority of the class. Again, the question is not whether every class member will be made whole, but whether the resolution of the case constitutes a fair compromise under all the circumstances. On the facts of this case, the long warranty extension provided by the settlement is more than fair.[11]

## C. There is No Basis for Refunding The Cost of Third-Party Extended Service Contracts

The settlement provides that, for those who wish to cancel their contracts, Sony will reimburse the cost of those extended service contracts that it is reasonable to assume were purchased to cover the cost of a green or yellow issue repair. Specifically, Sony will reimburse the cost of contracts purchased from the Company or its agent after July 15, 2006.

Some objectors contend that the cost of service contracts bought from retailers (*e.g.*, Sears, Best Buy, Circuit City, etc.), or from Sony before July 15, 2006, should also be

---

[11] Given that most Televisions are unlikely ever to have a green or yellow issue, and that it is impossible to predict which ones will and which will not, the suggestion from a few objectors that Sony should replace all optical blocks now – at a cost of more than $1000 each – is plainly unreasonable.

reimbursed.  However, contracts bought from retailers are almost always bought at the time of purchase, as were contracts bought from Sony before July 15, 2006.[12]  There is no reason to believe that those contracts were bought to cover potential green or yellow issue repairs.  Rather, they were almost certainly bought in the ordinary course to cover any repairs to any part of the Television that might become necessary.  The purchasers of those contracts got what they paid for and there is no reason to reimburse them.  On the other hand, those customers who needed a green or yellow repair and wanted to defray the cost of a similar subsequent repair, or who called Sony when they learned about the green and yellow issues and were counseled to buy an extended service plan, paid for something that is essentially the same as what they will now receive through the settlement.  In those cases, a refund is reasonable if the customer wishes to cancel the plan.[13]

**D.**    **A Purchase Price Refund Would Not Be a Compromise**

Finally, a number of objectors write that they should get their money back (or a free upgrade to a different television).  That, however, would not be a compromise of this case. Indeed, even if plaintiffs prevailed after trial, it is unlikely that a refund (or a new television) would be warranted given that most Televisions do not manifest a green or yellow issue and that those that do work properly after repair.

---

[12] The objectors' letters themselves reflect the fact that they bought their extended service contracts when they bought their Televisions.

[13] The propriety of this approach is enhanced by the fact that Sony receives revenue from service contracts purchased from the Company, but not from contracts bought from retailers.

The settlement provides substantial and meaningful relief to the class, relief that will ensure that all (or almost all) class members can have any green or yellow issue resolved without cost. That is a fair and reasonable compromise resolution of this case.

## CONCLUSION

For the reasons stated herein, the proposed settlement should be finally approved.

Dated:   New York, New York
         February 15, 2008

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP


By:  /s/ Robert D. Kaplan
         Robert D. Kaplan
Hallie B. Levin
Mary E. Mulligan

1633 Broadway
New York, New York 10019
(212) 833-1100

*Attorneys for Defendants Sony
Electronics Inc., Sony Corporation, and
Sony Corporation of America*