UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

IN RE SONY SXRD REAR PROJECTION TELEVISION
CLASS ACTION LITIGATION,                                    06 Civ. 5173 (RPP)

This Document Relates to:                          **OPINION AND ORDER**

ALL ACTIONS.

------------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On October 23, 2007, this Court preliminarily approved a proposed settlement

agreement between Plaintiffs and Defendants in the above-captioned class action.  The

parties now seek final approval of the proposed settlement agreement.  Plaintiffs also

move for certification of the settlement class and apply for an award of attorneys' fees

and reimbursement of expenses.  For the reasons stated below, the proposed settlement

agreement is approved, the settlement class is certified, and the application for the fee

award is granted.


**BACKGROUND**

   **A.  The Class Action**

        Plaintiff Michael Cook filed this case as a putative national class action on July 7,

2006.  An identical complaint was filed by Plaintiff Paul Krasnoff on September 29,

2006.  The Court consolidated the two actions on December 22, 2006, and Plaintiffs filed

a consolidated complaint thereafter.  After Defendants moved to dismiss the consolidated

complaint, Plaintiffs filed a First Amended Consolidated Class Action Complaint (the

"Complaint") dated February 19, 2007, which added sixteen new plaintiffs.[1]

The Complaint alleges a design defect in all rear projection, high-definition SXRD televisions with the model numbers KDS-R50XBR1 and KDS-R60XBR1 (the "Televisions"), manufactured and marketed by Defendants Sony Corporation, Sony Corporation of America, and Sony Electronics, Inc. (collectively "Sony") beginning in September 2005. The design defect (the "Defect") is alleged to exist in a component known as the "Optical Block," the central component of a projection television that projects the video image onto the screen. The Complaint alleges that the Defect causes a green haze in the middle of the screen (the "green issue"), a yellow stain appearing at the edge of the screen and expanding over time (the "yellow issue"), or other color anomalies on the screens of the Televisions. The Complaint further alleges that Sony was unable to permanently repair the Defect, and that consumers were forced to pay for replacement Optical Blocks at a cost of more than $1500.00 if the Defect manifested after the one-year manufacturer's warranty had expired.

The Complaint posits a class consisting of "all end user consumers in the United States who purchased or received as gifts the Televisions." (Settlement § 3.1.) Excluded from the class are Sony, its affiliates, and their employees and immediate family members, persons who purchased or acquired a Television for commercial sale or resale, persons who are claims aggregators, persons who claim to be an assignee of rights associated with the Televisions, and persons who timely and validly opted to exclude themselves from the class. (Id. § 3.2.) The Televisions were sold by Sony from

---

[1] Another case based on the same subject matter was filed in California Superior Court, San Diego County, on behalf of an asserted class of California consumers against California based Sony Electronics, USA, Inc. That case, Croft v. Sony Electronics, Inc., No. GIC879778, is encompassed in the proposed settlement agreement and is similarly terminated upon this Court's final approval.

approximately September 2005 to July 2006. As defined, the class has approximately 172,000 to 175,000 members.[2]

The Complaint asserts nine causes of action, including statutory and common law claims for breach of warranty, a claim of unjust enrichment, and statutory consumer protection claims under the law of California, the laws of 44 other states and the District of Columbia. On March 21, 2007, Sony filed a motion to dismiss for failure to state a claim and based on the inapplicability of California consumer protection law under the choice-of-law rules. (Mulligan Decl., Ex. 2.) Without responding to Sony's motion, Plaintiffs continued negotiations with Sony, and the parties entered into mediation in April 2007.

### B. Sony's Improvements to Correct the Defect

Sony claims that by September 2006, all of the Optical Blocks—including those manufactured for new Televisions and those available to be used as replacements for defective Optical Blocks—contained improvements that had been made on a rolling basis to resolve both the green and yellow issues at the heart of Plaintiffs' complaint. The green issue, which manifests itself immediately (Guillou Decl. ¶ 5; Hr'g Tr. at 36:25-37:3), was for the most part resolved within one month of the Televisions entering the market. By October 2005, Sony determined that the green issue was primarily due to temperature fluctuations at the calibration stage of the assembly line and made appropriate adjustments to guarantee temperature uniformity. (Guillou Decl. ¶ 5; Hr'g Tr. at 30:19-23.) Because only about 7000 Televisions had been manufactured at that point, the great majority of Televisions manifesting the green issue were among the first

---

[2] Sony's counsel approximates the number of class members at 172,000. Plaintiffs counsel approximates the number of class members at 175,000.

7000 produced. (Guillou Decl. ¶ 5.) Sony also recognized that there were other possible causes of the green issue, which were relatively minor and resolved by January 2006. (Guillou Decl. ¶ 6; Hr'g Tr. at 31:2-4.)

The yellow issue, which appears over time, took a relatively longer time to resolve. Sony discovered that the yellow issue was caused by the introduction of a microscopic material into one of the panels of the liquid crystal layer of the Television, which disrupted the uniformity of the liquid crystal layer when exposed to the ultraviolet radiation from the lamp that illuminates the whole Television. (Guillou Decl. ¶8; Hr'g Tr. at 31:9-20.) The extent of the yellow discoloration that resulted depended on how much of the microscopic material was present, which varied from set to set, and on how frequently the consumer used the Television. Between January 2006 and September 2006, Sony made two types of improvements to resolve the yellow issue: reduction of the amount of ultraviolet exposure and reduction of the amount of microscopic material introduced into the liquid crystal panel. (Guillou Decl. ¶ 9; Hr'g Tr. at 32:8-17.)

At the settlement hearing held by this Court on February 27, 2008, Plaintiffs' counsel stated that "we do think that Sony has successfully remanufactured the component." (Hr'g Tr. at 15:16-17.) The proof which satisfied them "that Sony had resolved this problem was the documents, the explanation of the engineers as to why the defect was manifesting itself in the first instance, how they overcame those problems to redesign the optical block, to assure themselves that the problem would not return, and the absence of consumer complaints that the defect had come back once the new optical block was installed." (Id. at 15:25-16:6.)[3]

---

[3] Plaintiffs counsel represented that since the new Optical Blocks had been incorporated in October 2006, the only problems reported by consumers were isolated instances of malfunction due to improper

## C.  The Settlement Negotiations

Although both Plaintiffs and Sony believed firmly in the strength of their cases, the parties agreed to negotiate a possible resolution of the case to avoid the risks and expenses inherent in complex class action litigation.  (Mulligan Decl. ¶ 5.)  Beginning in November 2006 and continuing through May 2007, the parties conducted intensive arm's-length negotiations.  (Mulligan Decl. ¶ 5.)  The negotiations culminated in a face-to-face mediation session in April 2007 before Richard C. Neal, a retired justice of the California Court of Appeals and nationally known mediator of complex matters, followed by several telephonic mediation sessions.  (Lax Affirm. ¶¶ 6, 7; Mulligan Decl. ¶ 5.)

Prior to and during negotiations, Plaintiffs conducted formal and informal discovery to be able to evaluate the strengths and weaknesses of their claims and set a factual predicate for a proposed resolution.  (Lax Affirm. ¶ 8; Mulligan Decl. ¶ 6.)  In particular, Plaintiffs conducted extensive review of key engineering documents produced by Sony, interviews of several Sony project engineers, consultation with experts, and due diligence discovery.  (Lax Affirm. ¶ 9; Mulligan Decl. ¶ 6.)  The discovery allowed the parties to establish the nature and cause of the green and yellow issues, the improvements Sony made to resolve those issues, the timing and efficacy of those improvements, and Sony's ability to replace defective Optical Blocks.  (Lax Affirm. ¶ 8; Mulligan Decl. ¶ 6.)

Based on their discovery, investigation and evaluation of the facts and law relating to all of the matters alleged in the pleadings, Plaintiffs and Sony agreed to settle the action under the terms of the proposed settlement agreement (the "Settlement") in May 2007.  (Lax Affirm. ¶ 10.)  The parties then negotiated attorneys' fees, returning to California for another session with Justice Neal in mid-June 2007 for that purpose.

installation of the Optical Block.  (Hr'g Tr. at 15:13-16, 16:19-22, 18:11-13.)

### D. The Settlement's Terms

The Settlement is intended to ensure that class members are reimbursed for expenses they may have incurred for repairs relating to the green or yellow issue, and that class members whose Televisions manifest a green or yellow issue in the future can have the Optical Block replaced in-home without cost and with maximum convenience. The Settlement is also designed to reimburse class members for any expense they might incur prior to the effective date of the Settlement in connection with the repair of an Optical Block. Specifically to those ends, the Settlement provides as follows:

1. **Extension of the Optical Block Warranty** – Sony will extend its manufacturer's limited warranty on the Optical Blocks through June 30, 2009 with in-home service to correct the Defect. (Settlement § 4.2.) The Televisions came with one-year limited warranties which, for class members who purchased Televisions between September 2005 and July 2006, were scheduled to expire between September 2006 and July 2007.

2. **Enhanced Warranty Fulfillment** – During the warranty extension period, Sony will maintain a dedicated toll-free telephone number for settlement class members to obtain a telephone diagnosis from a technical representative who will arrange for in-home service and for any necessary parts shipments, if necessary. In the event Sony is unable to ship a replacement Optical Block, if necessary, within 14 days following the initial telephone diagnosis, the settlement class member will have the option of waiting for the repair or exchanging the Television for a remanufactured SXRD XBR1 television. The parties acknowledge that any such replacement television may have a lower retail selling price than the original Television. (Settlement § 4.3.)

3. **Reimbursement of Expenses for Optical Block Repair** – Upon timely submission of a valid proof of claim, Sony will reimburse any settlement class member who incurred out-of-pocket expenses prior to the effective date of the Settlement for the replacement of an Optical Block (including shipping costs) for all such expenses. (Settlement § 4.4.)

4. **Reimbursement of Certain Extended Service Plans** – Upon timely submission of appropriate documentation, Sony will reimburse settlement class members who purchased an extended service contract from Sony or Sony's extended service plan providers after July 15, 2006 and before the effective date of the Settlement, if they wish to cancel it. (Settlement § 4.5.)

5. **Reimbursement of Certain Expenses Associated with SXRD Upgrades Prior to Effective Date** – Any class member who required more than one

Optical Block repair before the effective date of the Settlement and who elected to upgrade to an XBR2, A2000, or A2020 SXRD television will be reimbursed for the monies paid to Sony for the upgrade. (Settlement § 4.6.)

6. **Litigation Costs** – Sony will pay all costs of settlement administration, including notice, and will pay Plaintiffs' reasonable counsel fees and expenses as awarded by the Court, up to $1,600,000.00, in addition to the benefits provided to the class.

### E. Notice to the Class

On October 23, 2007, this Court granted preliminary approval of the proposed settlement and ordered notice to be sent to the class by mail or e-mail (where contact information was available in Sony's records), by newspaper publication, and by the establishment of a website. In compliance with the Court's order, on December 7 and 8, 2007, Sony sent the Notice of Class Action Settlement (the "Notice") (Cohen Aff., Ex. 1) by e-mail to a total of 53,151 class members, 6417 of which bounced back as undeliverable. (Id. ¶ 3.) On December 21, 2007, Sony sent the Notice by direct mail to 20,989 class members, including 3889 members whose e-mails had bounced back and for whom Sony had postal addresses. (Id.) On December 19 and 26, 2007, Sony published the Summary Notice of Class Action Settlement (id., Ex. 3) in *USA Today*. (Id. ¶ 4.) Lastly, in accordance with the Court's order, beginning October 30, 2007, the Notice and accompanying proof of claim form were posted on a Settlement Website maintained by Sony, and for two weeks beginning November 2, 2007, a link to the Settlement Website was maintained on the homepage of www.sonystyle.com. (Id. ¶ 5.)

The Notice advised class members of their right to object and to exclude themselves from the Settlement by filing and mailing a written objection or notice of exclusion by February 6, 2008. Out of the total class of approximately 175,000 members, only 22 opted out. (Mulligan Decl. ¶ 10.) Only 45 class members sent letters that could

read as objections. (Mulligan Decl. ¶ 10.) On February 27, 2008, this Court held a settlement fairness hearing in accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure.

**DISCUSSION**

**I.    Final Approval of the Settlement**

A class action cannot be settled without the approval of the district court after a hearing and on finding that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). In a case such as the one before the Court, where a settlement is negotiated prior to class certification, the proposed settlement "is subject to a higher degree of scrutiny in assessing its fairness." D'Amato, 236 F.3d at 85 (citing County of Suffolk v. Long Island Lighting, 907 F.2d 1295, 1323 (2d Cir. 1990)). To determine a proposed settlement's fairness, a district court examines both "the negotiating process leading up to the settlement as well as the settlement's substantive terms." Id.; see McBean v. City of New York, 233 F.R.D. 377, 382-83 (S.D.N.Y. 2006) (noting that the court "must examine both the procedural aspects of the settlement . . . and the substantive aspects of the settlement").

**A.  Procedural Fairness**

In assessing the fairness of the negotiating process, a court reviewing a proposed settlement must "ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." D'Amato,

236 F.3d at 85.  A proposed settlement enjoys a "presumption of fairness" where the settlement is indeed the product of "arm's length negotiations between experienced, capable counsel after meaningful discovery."  Wal-mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted); In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000); In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("So long as the integrity of the arm's length negotiation is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."), aff'd, 117 F.3d 721 (2d Cir. 1997).  A reviewing court should be "mindful of the strong judicial policy in favor of settlements, particularly in the class action context."  Wal-mart Stores, Inc., 396 F.3d at 116.

Having reviewed the available information regarding the negotiation process leading to the Settlement, the Court concludes that the process was fair.  The Settlement was the product of arm's length negotiations beginning in November 2006 and continued through June 2007 under the supervision of Justice Richard C. Neal, retired from the California Court of Appeals.  (Lax Affirm. ¶¶ 6, 7; Mulligan Decl. ¶ 5.)  The parties conducted a full-day mediation before Justice Neal in April 2007 and follow-up telephone mediation session with Justice Neal in late June 2007 to produce the final agreement.  (Mulligan Decl. ¶ 5.)

Moreover, the quality of attorneys for both sides and the extent of the discovery they undertook demonstrate the procedural fairness of the Settlement.  Both Plaintiffs' counsel, Robert I. Lax & Associates (see Compendium Pls.' Counsels' Decls., Ex. A), and Sony's counsel, Friedman Kaplan Seiler & Adelman LLP, have experience with complex commercial litigation and have dealt with similar cases.  Plaintiffs' counsel,

with the cooperation of Sony, conducted considerable pre-settlement and post-settlement

discovery to determine the strengths and weaknesses of the case and to set a factual

predicate for a proposed resolution. This discovery included failure analysis of the

Televisions and the Optical Blocks through consultations with video/electronic

engineering experts, interviews of several Sony project engineers, and an examination of

key engineering documents produced by Sony and third parties including Texas

Instruments, retailers, and after-market service providers, in addition to due diligence

discovery. (Lax Affirm. ¶ 9; Mulligan Decl. ¶ 6.) In view of these undertakings, the

Court concludes that counsel possessed the abilities, and conducted the discovery,

necessary to represent effectively the class members' interests in this case. Accordingly,

the Settlement is entitled to a presumption of fairness.[4]

## B. Substantive Fairness

In reviewing a proposed settlement for substantive fairness, reasonableness and

adequacy, a district court must consider the following nine factors, known as the <u>Grinnell</u>

factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the proceedings and
> the amount of discovery completed; (4) the risks of establishing liability;
> (5) the risks of establishing damages; (6) the risks of maintaining the class
> action through the trial; (7) the ability of the defendants to withstand a
> greater judgment; (8) the range of reasonableness of the settlement fund in
> light of the best possible recovery; (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant risks of
> litigation.

<u>Detroit v. Grinnell Corp.</u>, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted); <u>see also</u>

<u>Walmart-Stores, Inc.</u>, 396 F.3d at 117. When assessed in light of these factors, the

Settlement is fair, reasonable and adequate.

---

[4] None of the objections to the Settlement are directed toward the negotiations process.

### 1. Complexity, expense and likely duration of litigation

The Court agrees with both parties that the complexity, expense and likely duration of the litigation going forward weigh in favor of approval of the Settlement. Sony asserted numerous arguments in seeking to dismiss this action and is prepared to defend this case vigorously. Were litigation to continue, Plaintiffs would face expensive and risky motion practice before the case proceeded past the pleadings and an aggressive challenge to class certification. If the case survived beyond the pleading and certification stage, a trial of this technical case would take at least one month, according to Plaintiffs' counsel's estimate, and require testimony of numerous Sony engineers through interpreters and of several expert witnesses concerning complex subject matter such as optical physics and electronic engineering.

Not only would Plaintiffs spend substantial sums in litigating this case through trial and appeals, it could be years before class members saw any recovery, if at all. The considerable expense and duration of further litigation would disadvantage the class members by potentially reducing the class recovery, providing a disincentive to later settlement, and precluding class members who desire immediate repairs to their defective Televisions from receiving such repairs. Under these circumstances, final approval of the proposed settlement is justified. See, e.g., In re Veeco Instruments Inc. Sec. Litig., No. 05 MDL 0165, 2007 WL 4115809, at *7 (S.D.N.Y. Nov. 7, 2007) (approving settlement and concluding that "[d]elay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value").

### 2. Reaction of the class to the Settlement

Members of the class appear to be predominantly in favor of the Settlement. Plaintiffs' counsel attests to having received numerous telephone calls and notes from class members expressing gratitude for the result achieved in this action (Lax Affirm. ¶ 20) and several letters of support for the Settlement (see, e.g., Letter from Gerald Simmons in Support of Settlement, Docket No. 72). Of approximately 175,000 class members, only 22 (0.0126%) have chosen to opt out of the class, and only 45 have voiced objections. The small number of opt-outs and objections relative to the size of the class in this case supports approval of the Settlement. See Wal-Mart Stores, Inc., 396 F.3d at 118 (concluding that only 18 objections from a class of five million was indicative of the adequacy of the settlement); D'Amato, 236 F.3d at 86-87 (holding that the district court properly concluded that 18 objections from a class of 27,883 weighed in favor of settlement); see also In re Am. Bank Note Holographics, Inc., 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) (noting that "the lack of objections may well evidence the fairness of the Settlement").

### 3. Stage of the proceedings and amount of discovery completed

The parties entered into settlement agreement only after pre-settlement informal discovery and confirmatory discovery, which allowed the parties to develop the facts necessary to evaluate the claims and adequacy of the Settlement. As noted earlier, Plaintiffs' counsel obtained from Sony thousands of pages of key internal documents concerning the engineering of the Televisions and access to appropriate Sony engineering personnel. Plaintiffs reviewed those Sony documents, interviewed Sony personnel, subpoenaed documents from Texas Instruments concerning the testing of the Televisions, and consulted with experts and third parties concerning the Defect. (Lax Affirm. ¶¶ 5, 9;

Mulligan Decl. ¶ 6.)  In addition, Plaintiffs' counsel conducted due diligence discovery to verify Sony's identification of the cause of the Defect, its successful redesign of the Optical Block to permanently correct the Defect, as well as Sony's ability to deliver and implement the repair for consumers in a timely manner.  (Lax Affirm. ¶ 8.)

Although the parties did not engage in extensive formal discovery, such efforts are not required for the Settlement to be adequate, so long as the parties conducted sufficient discovery to understand their claims and negotiate settlement terms.  See D'Amato, 236 F.3d at 87 (weighing this factor in favor of settlement approval because "although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information"); In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims.").  In fact, informal discovery designed to develop a settlement's factual predicate is encouraged because it expedites the negotiation process and limits costs which could potentially reduce the value of the settlement.  See Jones v. Amalgamated Warbasse Houses, Inc., 97 F.R.D. 355, 360 (S.D.N.Y. 1982) ("Although little formal discovery has occurred, the parties freely exchanged data during settlement talks.  In view of the way this speeds the negotiation process, informal 'discovery' is to be encouraged.").  The current stage of these proceedings—the point at which the parties have conducted sufficient discovery to understand the claims and reach a settlement without incurring excessive costs—weighs in favor of settlement approval.

### 4.  Risks of establishing liability and damages

Plaintiffs, as well as the Court, acknowledge the risk of establishing liability and

damages against Sony in this case. Not only has Sony vigorously denied liability, but Plaintiffs' counsel also recognizes that some of Sony's arguments both against class certification and the substance of the case could prevail were this case to proceed. In particular, Plaintiffs face difficult choice-of-law and pleading issues, which Sony raised in its motion to dismiss. Plaintiffs' California consumer protection claim is not likely viable because courts have consistently held that each class member's consumer protection claim is governed by the law of his or her home state,[5] and not a single named Plaintiff resides in California. Plaintiffs' breach of warranty claims face the challenge that the Sony warranty only guaranteed that, for one year, Sony would repair any defective Television without charging for either parts or labor; it did not warrant that none of the Televisions would be defective. Plaintiffs must therefore establish that Sony failed or refused to make warranty repairs to establish Sony's breach of warranty.

In addition to these substantive issues, Plaintiffs face the more practical risks of uncertain witness testimony, the strength of Sony's expert testimony against Plaintiffs' own expert's testimony, and a jury's unfavorable determinations of fact should this case survive to the trial stage. All of these risks make the fairness of the Settlement all the more evident.

**5. Risks of maintaining the class through trial**

Even if the class was certified against Sony's opposition, there is a significant risk that the class could not be maintained through trial. Rather than wait for the outcome of a lengthy litigation process, some members would conceivably seek more expedient relief in replacing or repairing their defective Televisions. In the meantime, Sony's case could

---

[5] See, e.g., In re Rezulin Prods. Liab. Litig., 392 F. Supp. 2d 597, 612 (S.D.N.Y. 2005); Leider v. Ralfe, No. 01 Civ. 3137, 2003 WL 24571746, at *11 (S.D.N.Y. Mar. 4, 2003); Plymack v. Coply Pharm. Inc., No. 93 Civ. 2655, 1995 WL 606272, at *4 (S.D.N.Y. Oct. 12, 1995).

gain strength if time gave way to more evidence that the green and yellow issues had been fully resolved by the improvements made between October 2005 and September 2006. The risk that Plaintiffs' would be unable to maintain the class through trial weighs in favor of approving the Settlement. It should be noted that the Settlement guarantees relief to all consumer owners of the Televisions nationwide, not merely those residing in the two jurisdictions in which cases are pending.

### 6. Ability of the defendants to withstand a greater judgment

Without a doubt, Sony could withstand a greater judgment. But a defendant is not required to "empty its coffers" before a settlement can be found adequate. McBean, 233 F.R.D. at 388. Here, the Settlement reasonably provides Plaintiffs with benefit-of-the-bargain relief in the form of repair or replacement of the defective Optical Block, a warranty extension, and reimbursement of repair costs previously incurred. Where, as here, the other Grinnell factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair. See D'Amato, 236 F.3d at 86.

### 7. Range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation

The final two Grinnell factors require the Court to consider whether the Settlement falls within the "range of reasonableness." The Second Circuit has described the "range of reasonableness" as "'a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in . . . any litigation.'" Wal-Mart Stores, Inc., 396 F.3d at 96 (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)). The Settlement in this case provides a comprehensive remedy to class members, guaranteeing cost-free and expedient in-home repair to

members whose Televisions are diagnosed with a green or yellow issue (or any other defect in the Optical Block), and reimbursing out-of-pocket expenses if an Optical Block repair is required. This remedy is well within the range of reasonableness in view of the risks of litigation that Plaintiffs face.

### C.  The Objections to the Settlement

Following notification of the Settlement, 45 consumers submitted objections. The objections generally fall into one of four categories: (1) the amount of relief inadequately compensates class members; (2) the Settlement should cover different model Televisions or problems other than the Optical Block defect; (3) the reimbursement provision of the Settlement should include refunds for upgrades to other models of televisions than those covered by the Settlement; and (4) the Settlement fails to compel Sony to refund expenditures by class members who purchased extended warranties prior to the Defect becoming known or who purchased extended warranties from non-parties to this litigation. As explained below, however, none of these objections provides a basis to reject the Settlement.

#### 1.  Objection to the adequacy of relief

The first category of objections includes complaints that the Settlement should provide members of the class with complete refunds for the Televisions, brand new replacement Televisions, or indefinite extension of the warranty on the Optical Block. While such remedies may be preferable, they do not represent a reasonable compromise. A complete refund or a new Television for each member of the class, regardless of whether or not a Defect was experienced, is unwarranted if Sony fulfills the warranty under the Settlement by providing a replacement Optical Block containing all of the

improvements eliminating the green and yellow issues. Such a remedy is particularly unreasonable in view of the fact that many of the Televisions, particularly the later-manufactured ones, contain improved Optical Blocks that are unlikely to present either the green or yellow issue in the future.

An indefinite extension of the warranty on the Optical Block is similarly outside the range of reasonableness. No electronics manufacturer warrants that their products will be free from failure forever, nor does the law require such a promise. The Settlement extends Sony's one-year warranty that came with the Television through June 30, 2009. Such an extension to a date certain is reasonable in this case because it affords the longest warranty to those class members who are most likely to experience a Defect—i.e., those who purchased their Televisions at the earliest date, when fewer or no improvements had been made to the Optical Block.

This approximately three-year extension of the warranty is also fair because it is nearly certain that any class member who will experience a problem with the Optical Block will do so before June 30, 2009. The green issue, if it exists, appears soon after the Television is first turned on. (Guillou Decl. ¶ 5; Hr'g Tr. at 36:25-37:3.) According to Sony service data, the yellow issue, if it exists, will appear after the Television has been on for no more than 3000 hours. (Guillou Decl. ¶ 11; Hr'g Tr. at 37:19-23.) Based on industry statistics, the average consumer in the United States keeps his television on for 6.7 hours per day; therefore, 3000 hours is approximately 15 months of ownership. (Guillou Decl. ¶ 11; Hr'g Tr. at 37:23-38:1.) This estimate may be conservative in this case, assuming that consumers who spend $4,000 to $5,000 on a television are likely to watch television more frequently than the average consumer. (Hr'g Tr. at 38:2-5.)

Finally, the warranty extension to a date certain of June 30, 2009 provides for easy administration, which benefits the class members who are entitled to repairs or reimbursements under the Settlement.

### 2. Objection to the scope of the Settlement

Some objections to the Settlement were not made by class members, but rather by consumers of different Sony televisions or consumers experiencing problems other than the green or yellow issue in the Optical Block. These objectors wish to be included within the scope of the Settlement. While the Court makes no judgment as to the merits of the claims, these objections do not affect the reasonableness of the Settlement reached by the parties to this action. The failure of a settlement to compensate non-members of the class is not a ground for rejection of the settlement. Moreover, these objectors' claims are not prejudiced in any way because the Release of the Settlement is sufficiently narrow that it does not compromise any claims unrelated to defects in the Optical Block.

### 3. Objection to the limitation of the upgrade refund to certain models

The Settlement reimburses consumers who paid Sony for an upgrade of the Televisions to other Sony models after Sony unsuccessfully attempted to repair the Optical Block. After lengthy negotiations, the models to be included in this provision were limited to models with similar technology and functionality to the XBR1 Televisions. The reasoning behind this limitation was that a consumer who paid for an upgrade to a comparable Sony television after an unsuccessful repair attempt was likely seeking such an upgrade due to the Defect, rather than due to a desire for a television set with different or more advanced features. Limiting the reimbursements in such a way was consistent with Settlement's design to give class members benefit-of-the-bargain

relief.

A few objectors have expressed dissatisfaction with the Settlement because it does not reimburse them for the money they paid to upgrade to a model not covered by the Settlement. But the non-covered models which the objectors seek to include have different technology or features than the XBR1 Televisions, including LCD flat screens which can be hung on a wall. It can be assumed that a consumer choosing to upgrade to such a model was likely basing his or her decision on a desire for additional features rather than a desire simply to replace his or her defective television set. In negotiating the Settlement, the parties reasonably drew the line, which had to be drawn somewhere, to include only those models that were comparable to the XBR1 Televisions. Expanding the relief to include reimbursement for upgrades to more advanced models is not warranted, nor is it a basis to reject the Settlement.

### 4. Objection to the limitation of the refund for extended warranty plans to those purchased from Sony after June 15, 2006

The Complaint claims that Sony was unjustly enriched by the marketing and sale of extended warranty service plans after knowledge of the Defect had become widespread. Specifically, Plaintiffs allege that Sony used the existence of the Defect as a marketing tool to sell consumers extended warranty service plans to obtain repairs for a problem which Sony was legally bound to provide. Based on this allegation, the parties negotiated a provision in the Settlement that Sony will offer cash refunds to consumers who purchased extended warranties after July 15, 2006, the date by which the parties agreed knowledge of the Defect became generally know and the Televisions unavailable through retail sales channels. To qualify for such a refund, the class member must have

purchased the extended warranty service plan after July 15, 2006, and from either Sony or Sony's extended service plan providers.

Some class members object that this refund provision of the Settlement should also cover extended warranties purchased along with the Televisions and extended warranties purchased from third-party vendors, such as Best Buy and Sears, at the time the defect was known. Such a remedy, however, would go beyond the scope of the claim. Class members who purchased extended warranties along with their Televisions had no knowledge of the Defect at that time; therefore, their payments are not related to Defect and would have been incurred regardless of the Defect. Since these class members did not rely on misrepresentations by Sony regarding the Defect, they cannot demonstrate Sony's liability or their entitlement to relief based on an unjust enrichment theory. Similarly, class members who purchased extended warranties from third-party vendors are not entitled to the refund because there is no allegation that outlets like Best Buy, Wal-Mart, and Sears used unfair marketing tactics in connection with the sale of these warranties. Moreover, these third parties are not parties to this litigation and cannot be expected to refund such purchases. This category of objection therefore is not ground for rejecting the Settlement.

## II.    Certification of the Settlement Class

The second part of Plaintiffs' application is a motion to certify a settlement class (the "Settlement Class"), to which Sony agreed. As stated earlier, the Settlement Class consists of all end user consumers in the United States who purchased or received as gifts Sony SXRD high definition television models KDS-R50XBR1 and KDS-R60XBR1, excluding (a) Sony, its affiliates, and their employees and immediate family members; (b)

persons who purchased or acquired a Television for commercial use or resale; (c) persons who are claims aggregators; (d) persons who claim to be an assignee of rights associated with the Televisions; and (e) persons who have timely and validly opted out of the Settlement Class.  (Settlement § 3.1-.2.)  On October 23, 2007, this Court entered an order preliminarily certifying the Settlement Class and requiring notice to be sent to the class members by mail or e-mail, by newspaper publication, and by the establishment of a website so that members who wished not to be bound by the Settlement's terms could timely opt out of the class.  The parties fully complied with the order in November and December of 2007.

Before a class may be certified, the party seeking class certification must satisfy two requisites under Rule 23 of the Federal Rules of Civil Procedure.  First, Plaintiffs must show that the four requirements under Rule 23(a) are met:  (i) the class is so numerous that joinder of all members is impractical; (ii) there are questions of law and fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (iv) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 132-33 (2d Cir. 2001).  Second, Plaintiffs must show that at least one of the provisions of Rule 23(b) is satisfied.  Here, Plaintiffs seek to show they satisfy Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### A.  Requirements of Rule 23(a)

### 1. Numerosity

The class is undeniably large, and joinder of all the members would be a formidable challenge. The class comprised of approximately 175,000 members across the country, totaling the number of Televisions sold in the United States. While the number of members who actually experience a Defect may be smaller, proposed classes of this size generally meet the numerosity requirement. See Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (concluding that a class of 100,000 children "is obviously numerous, and individual joinder would be virtually impossible"); Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (stating that "numerosity is presumed at a level of 40 members"). In any event, "impracticable" joinder of all the members simply means difficult or inconvenient, not impossible, joinder. See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993); Reynolds v. Giuliani, 118 F. Supp. 2d 352, 388 (S.D.N.Y. 2000). Under this standard, the numerosity requirement is certainly met.

### 2. Commonality

The commonality requirement is met if Plaintiffs' grievances share a common question of law or of fact. Fed. R. Civ. P. 23(a)(2); In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir. 1987). It is "not require[d] that each class member have identical claims as long as at least one common question of law or fact is evident." In re Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555, 562 (S.D.N.Y. 2004). Here, common issues of law and fact predominate over the case. The primary issues concern the existence of a design defect in the Optical Block which manifests as either a green or yellow issue and Sony's common course of conduct relating to the sales of the Televisions to class members. These common issues are sufficient to satisfy the

commonality requirement, which is "generally considered a 'low hurdle' easily surmounted." In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995).

### 3. Typicality

Typicality requires that the claims of the class representatives be typical of those of the class, and "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Robidoux, 987 F.2d at 936 (citing In re Drexel Burnham Lambert Group Inc., 960 F.2d 285, 291 (2d Cir. 1992)). In this case, the claims of the representative Plaintiffs and the claims of every class member arise from the same conduct by Sony—the sale of televisions containing an alleged defect, the warranty of such televisions, and the practice of selling extended warranties after the alleged defect became known. The claims of the representative Plaintiffs are based on the same legal theories as the claims of each member of the class—breach of warranty, unjust enrichment, and violation of consumer protection law. To the extent there is any variation, such differences are minor and do not defeat the typicality requirement. See In re Oxford Health Services, Inc., Sec. Litig., 191 F.R.D. 369, 375 (S.D.N.Y. 2000) ("Typicality does not require that the situations of the named representatives and the class members be identical."). The typicality requirement is thus satisfied.

### 4. Adequacy

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997). To that end, the adequacy requirement is not

satisfied unless the class representatives are part of the class and "possess the same interest and suffer the same injury as the class members." Id. at 625-26. In this case, the class representatives suffered the same specific injury as the class members—the loss incurred by purchasing an XBR1 Sony television containing a defective Optical Block. The class representatives also have the same interest as the rest of the class members and are in a similar position with respect to their ability to obtain a remedy in view of Sony's defenses. Under these circumstances, there appears to be no actual or potential conflict of interest between the class representatives and the class members they seek to represent.

The adequacy inquiry also factors in competency and conflicts of class counsel. Amchem Prods., 521 U.S. at 626 n.20. Here, class counsel competently handled the minor variations in the Plaintiffs' positions and obtained a settlement that resolves the issues faced by all members of the class. Plaintiffs have thus shown that the adequacy requirement is satisfied.

### B. Requirements of Rule 23(b)(3)

To certify a class, Plaintiffs must also satisfy one of the provisions of Rule 23(b). Plaintiffs urge the Court to find under Rule 23(b)(3) "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### 1. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. To meet the predominance requirement of Rule 23(b)(3), Plaintiffs must

establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." Visa Check/MasterMoney, 280 F.3d at 136 (internal quotation marks omitted). As the Supreme Court has noted, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Amchem Prods., 521 U.S. at 625. This consumer fraud action is such a case. Class treatment is appropriate here because members of the class allege the same product defect and unlawful sales practice of Sony. These allegations are subject to generalized proof to establish breach of express and implied warranties, violation of consumer protection law and unjust enrichment. In other words, the same evidence would be used to prove the claims against Sony whether the claims proceed as a class action or individual actions.

Moreover, members of the class are affected by Sony's actions in a substantially similar way. This is not a case where "individual stakes are high and disparities among class members great," as in certain mass tort cases. See Amchem Prods., 521 U.S. at 625 (holding in an asbestos case that the fact that all members had been exposed to asbestos products was insufficient to meet predominance standard, as different members were exposed to different products for different amounts of time in different ways, and differences in state law compounded those disparities). Here, the class members all purchased Televisions that contain or may contain an alleged defect in the Optical Block and paid Sony or may be required to pay Sony for repairs or replacements. To the extent there are subcategories within the class—e.g., those who purchased extended warranties after the Defect became known and those who exchanged their Televisions for upgraded models after unsuccessful repair attempts by Sony—their issues do not overwhelm the

common questions of the class and are covered without conflict in the Settlement. Under these circumstances, Plaintiffs meet the predominance requirement. See <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 169 F.R.D. 493, 517 (S.D.N.Y. 1996) (noting that the predominance requirement is generally satisfied "unless it is clear that individual issues will overwhelm the common questions").

### 2. Superiority

Rule 23(b)(3) further requires "that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In assessing whether to certify a class under Rule 23(b)(3), a court should consider the following nonexclusive factors: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.[6] Fed. R. Civ. P. 23(b)(3)(A)-(C). These factors weight in favor of certification.

With respect to the first factor, the individual members of the class do not have an interest in individually prosecuting their cases. While the class-wide damages are considerable in the aggregate, the individual damages may be too small to make litigation worthwhile. The advantage of the class action is that it "permits plaintiffs to pool claims which would be uneconomical to litigate individually." <u>Phillips Petroleum Co. v. Schutts</u>, 472 U.S. 797, 809 (1985). Certification is favored where, as here, the individual class members "may have insufficient economic justification for commencing expensive

---

[6] When faced with a request for settlement-only class certification, a district court need not consider the fourth factor listed under Rule 23(b)(3)(D)—whether the class action, if tried, would present intractable management problems. <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 620 (1997).

litigation." In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 386 (S.D.N.Y. 1996).

The second and third factors also weigh in favor of certification. Aside from Croft v. Sony Electronics, Inc., filed in California Superior Court and encompassed in the Settlement before this Court, the Court is unaware of any related cases pending in other courts. This Court is an appropriate forum for this case because the Court has personal jurisdiction over all the parties and authority to approve a release of nationwide class claims. Based on a consideration of these factors, the Court concludes that a class action is a superior method of adjudicating this case and that certification of the Settlement Class is appropriate. The Settlement Class is hereby certified.

## III. Approval of Attorneys' Fees

Class counsel's final application is for an award of attorneys' fees and expenses of $1.6 million, which Sony has agreed to pay. This sum is to compensate Plaintiffs' counsel as well as counsel in the related California action and covers both expenses and attorneys' fees based on the firms' individual billing rates. The firms acting as counsel for the class collectively incurred $49,750.09 in expenses and spent a total of 2414.12 hours in performance of their services. (Compendium Pls.' Counsels' Decls. at 1.)

In reviewing a class action settlement agreement for final approval, a district court must assess the reasonableness of the attorneys' fees. See 4 Newberg on Class Actions § 14:1 (4th ed. 2002); see also In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 819 (3d Cir. 1995) (stating that "a thorough judicial review of fee applications is required in all class action settlements"). Under Rule 23(h), "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In this case, the parties negotiated and

agreed upon the attorneys' fee provision in the Settlement. The negotiation of fee agreements is generally encouraged. See Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) ("A request for attorneys' fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

The attorneys' fees in this case will not be awarded from a "common fund" created for the class as a whole. Here, Sony has agreed to pay the negotiated fee in addition to the class recovery. Thus regardless of the size of the fee award, class members who apply for recovery under the terms of the Settlement will receive the same benefit; the fee award does not reduce the recovery to the class. Under these circumstances, the danger of conflicts of interest between attorneys and class members is diminished. See McBean, 233 F.R.D. at 392 (stating that if "money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members"). Still, even where the defendant pays the attorneys' fees, a court must assess the reasonableness of the fee award, particularly because practical realities suggest that generally "a defendant is interested only in disposing of the total claim asserted against it," and not in "the allocation between the class payment and the attorneys' fees." In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d at 819-20.

In this case, a few important factors support the reasonableness of the attorneys' fees to which the parties agreed. First, the fee was negotiated only *after* agreement had been reached on the substantive terms of the Settlement benefiting the class. (Lax Affirm. ¶ 34.) This tends to eliminate any danger of the amount of attorneys' fees

affecting the amount of the class recovery. Second, the attorneys' fees were negotiated at arm's length under the supervision of Justice Neal. (Lax Affirm. ¶ 36.) In conducting negotiations before Justice Neal, the parties considered the amount of the requested fee relative to class counsel's lodestar and the value of the Settlement and reviewed confidential mediation statements specifically addressing the fee issue after all other aspects of the Settlement had been resolved. (Id.) Negotiations under such conditions support a finding that the requested fee is reasonable. See McBean, 233 F.R.D. at 392 (stating that "the fact that the award was the product of arm's-length negotiations under the supervision of Judge Katz weighs strongly in favor of approval"). And third, none of the objections to the Settlement took issue with the requested fee award. Together these factors indicate that the negotiated fee award of $1.6 million is reasonable.

Finally, the reasonableness of the requested fee award can be tested by using the lodestar method of calculating reasonable attorneys' fees in common fund cases. The lodestar method calculates fees by multiplying the number of hours expended by an hourly rate appropriate for the region and experience of the lawyer. Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000). The district court may in its discretion increase the lodestar by applying a multiplier based on factors such as the risk of the litigation and the performance of the attorneys. Id.

The Court has reviewed the hourly rates charged by each of the plaintiff firms and the number of hours expended by each attorney and finds the hours and rates to be reasonable in the context of this litigation and its settlement. Based on each firm's current hourly billing rates, the cumulative lodestar for the services performed by all counsel for the class is $1,279,405.00. Counsel requests a multiplier of 1.21 of the

counsel for the class is $1,279,405.00. Counsel requests a multiplier of 1.21 of the cumulative lodestar for a total fee of $1,550,249.91 excluding expenses, which is the figure negotiated at arm's length before Justice Neal. A multiplier of 1.21, which is at the low end of the range of multipliers applied in this circuit, is reasonable in light of the risks undertaken by Plaintiffs' counsel in accepting this litigation and the considerable time and resources expended on behalf of Plaintiffs despite those risks, particularly because of Sony's steadfast defense of its case and the extensive technical discovery required to prove liability. Under these circumstances, the negotiated fee award of $1.6 million to cover Plaintiffs' attorneys' fees and un-reimbursed expenses is approved.

## CONCLUSION

For the reasons stated above, the parties' motion for final approval of the Settlement, Plaintiffs' motions for certification of the Settlement Class, and Plaintiffs' counsel's application for an award of attorneys' fees and reimbursement of expenses are granted.

IT IS SO ORDERED.

Dated: New York, New York
May 1, 2008

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this order sent to:**

*Attorneys for Plaintiffs*

Robert I. Lax & Associates
Attn: Robert Ian Lax, Daniel E. Sobelsohn

30

(212) 818-9150
Fax: (212) 208-4309

The Herskowitz Law Firm
Attn: Jon M. Herskowitz
9100 S. Dadeland Blvd, Suite 1000
Miami, FL 33156
(305) 670-0101
Fax: (305) 670-2393

Lange & Koncius, LLP
Attn:  Joseph J.M. Lange, Jeffrey A. Koncius
222 N. Sepulveda Blvd, Suite 1560
El Segundo, CA 90245
(310) 414-1880
Fax: (310) 414-1882

*Attorneys for Defendants*

Friedman Kaplan Seiler & Adelman LLP
Attn: Amy Christine Brown
1633 Broadway
New York, NY 10019
(212)-833-1239
Fax: (212)-373-7939